Filed 4/18/22

# CERTIFIED FOR PARTIAL PUBLICATION[*]

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073346 |
| v. | (Super.Ct.No. FSB18003370) |
| AARON JAMES VAUGHN et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County. William Jefferson Powell IV, Judge. Affirmed as modified with directions.

Jennifer Peabody; Helen S. Irza, under appointment by the Court of Appeal, for Defendant and Appellant Aaron James Vaughn.

Cara DeVito, under appointment by the Court of Appeal, for Defendant and Appellant Victor Wilkins.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, IV, V, VI, VIII, IX, and X.

1

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Daniel Rogers, Lise Jacobson, and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

In an exhaustive 19-day jury trial, after 17 witnesses testified and 97 exhibits were admitted, defendants Victor Wilkins and Aaron James Vaughn were found guilty of human trafficking and multiple counts of pimping and pandering; some counts involved a minor victim.

In very brief outline, a San Bernardino police officer stopped an apparent prostitute for indecent exposure. She indicated that she was 17 years old, and that she was walking the street with a second prostitute. She had a keycard to Room 112 in a nearby motel. Room 112 was rented to Wilkins; he had checked in with Vaughn, who had rented Room 109. At trial, the prostitute testified that Wilkins was her pimp, and Vaughn was the second prostitute's pimp. This was corroborated by text messages and photos from the cellphones of Wilkins, Vaughn, and the prostitute. This evidence also showed that Wilkins had pimped (or attempted to pimp) two additional prostitutes.

In this appeal, Wilkins and/or Vaughn contend:

(1) San Bernardino County was not the proper venue for some counts.

(2) The trial court erred by denying defendants' motions for severance.

(3) The trial court erred by denying Wilkins's motion to suppress the evidence obtained as a result of a warrantless entry into his motel room.

2

(4)  The trial court erred by denying defendants' motion for a mistrial after one prospective juror said, during voir dire, that someone found guilty of the charged crimes should be publicly executed.

(5)  There was insufficient evidence that Vaughn knew that the minor victim was underage to support his convictions for human trafficking of a minor and pimping a minor.

(6)  The trial court abused its discretion by denying Wilkins probation and by imposing the upper term for human trafficking of a minor.

(7)  The trial court violated Penal Code section 654[1] by imposing a separate and unstayed sentences for both pimping and pandering of the same victim.

We agree that the sentences violated section 654.  However, we find no other error, or, at least, no other prejudicial error that has been preserved for appeal. Accordingly, we will modify the sentences and we will affirm the judgments as modified.

I

STATEMENT OF FACTS

A.  *Testimony of Jane Doe*.

Through most of 2018, Jane Doe[2] was 17.  In March 2018, she was working as a

---

[1]     All further statutory citations are to the Penal Code, unless otherwise indicated.

[2]     The minor victim was referred to below by this fictitious name.  We have not found any trial court order authorizing this.  (See § 293.5.)  Nevertheless, we do the same, to provide protective nondisclosure.  (Cal. Rules of Court, rule 8.90(b)(4).)

prostitute in Oakland.  Her pimp used the moniker "DeeTee."

Around the end of May, DeeTee became physically abusive.  Around the same time, Jane started communicating with Wilkins through Tagged (a dating app) and Instagram.  He indicated that he was a pimp.  He used the moniker "Polo" or "Polo Junky."  In the pimping subculture, "POLO" stands for "pimps only live once."

On June 1, after DeeTee gave Jane another beating, she contacted Wilkins and met him at a Jack in the Box in Oakland.  This made it official that he was her pimp.  Jane brought along a second prostitute called Molly, whom she had met a few days earlier.

Wilkins took Jane and Molly to a Motel 6 in Oakland.  He talked to them both about working as prostitutes for him.

As a result, as we will discuss in more detail below, Jane worked for Wilkins as a prostitute in Oakland, San Francisco, Los Angeles, and San Bernardino.  He gave her "rules" about where to walk, how to "catch dates," "what to allow," and what to charge.  He supplied her with condoms.  She turned all of her earnings over to him.

On the night of June 1, Wilkins drove Jane and Molly to San Francisco, where they walked the blade.[3]  However, there were no customers, and there were a lot of police.

Around 3:00 a.m. on June 2, Wilkins picked them up and drove them back to the Motel 6.  On the way, they picked up Vaughn.  Vaughn used the moniker "Royal" or "Royalty."  Wilkins introduced Vaughn as someone close, "like a cousin, [a] brother."

---

[3]     The "blade" (or "track") is a street frequented by prostitutes.

Wilkins said he was going to talk to Vaughn "about Molly going with [Vaughn]." Jane understood this to mean that Wilkins and Vaughn were "partner[s]."

In the early morning of June 2, Wilkins and Vaughn dropped Jane off on the blade in Oakland, where she worked as a prostitute until late morning. Wilkins and Vaughn picked her up, then picked up Molly. They all went back to the Motel 6. Wilkins and Vaughn told Jane that Vaughn was now Molly's pimp.

Around noon on June 2, at Wilkins's direction, the group left to go to the Los Angeles area. They arrived around 6:00 or 7:00 p.m. They got two rooms at a motel; Jane stayed with Wilkins, and Molly stayed with Vaughn. Wilkins and Vaughn dropped Jane and Molly off on the blade.

On the night of June 3-4, Jane was out on the same blade again. Molly was also out on the blade; "a handful of times," Jane saw her get into a car. At one point, Wilkins and Vaughn drove by to check on Jane.

While in the Los Angeles area, Jane told Molly that she wanted to leave Wilkins. Somehow, Wilkins got wind of this. He and Vaughn confronted Jane. Wilkins told Jane, "If [she] left him, [she] wouldn't get nowhere." Vaughn told Jane that Wilkins "was a good person" who "was there for [her] best interest."

On June 4, Wilkins decided they should all go to San Bernardino. They arrived around noon. Wilkins and Vaughn got two rooms at the Econo Lodge. Once again, Jane stayed with Wilkins, and Molly stayed with Vaughn. Wilkins gave Jane a keycard to their motel room, Room 112.

5

The blade was nearby, so Jane walked there.  She saw Molly on the blade.  Jane had not been there long when a police officer stopped her for indecent exposure, because one of her breasts was visible through her fishnet top.

She lied to him about almost everything.  She said she was 20, then said she was 18; however, she gave him a date of birth that made her 17.  She said she had come down from Antioch with "two girls."  At one point Molly walked by, and Jane pointed her out as "the individual [she] came with."  Meanwhile, Jane saw Wilkins drive by twice.  A female officer arrived, searched Jane, and found the keycard.

At the police station, Detective Kimberly Hernandez  interviewed Jane.  At first, Jane continued to lie.  She identified her pimp as DeeTee and said he brought her to San Bernardino.  She denied knowing Wilkins.  She identified Vaughn as another pimp she had met in Oakland.

Eventually, however, Jane admitted that Wilkins was actually her pimp and that she had come down with him.  She had turned over to him a total of "two bands," meaning $2,000.

At some point, Jane overheard Wilkins and Vaughn talking about Molly giving money to Vaughn.  However, she never actually saw Molly give Vaughn any money.

Jane never told Wilkins how old she was.

B.    *The Police Investigation*.

Via Jane's keycard, the police located Wilkins and Vaughn at the Econo Lodge and arrested them.  "[L]arger-size" women's clothing and shoes were found in Wilkins's room.  "[S]maller-sized" women's clothing was found in Vaughn's room.

When Wilkins was booked, he was found to have $900 in cash.  He had "POLOIZM" tattooed on his hand.  Vaughn had a tattoo of a crown with the words, "Royal Majesty."  He also had an "IZM" tattoo.

When Detective Hernandez used her own phone to call the number listed in Jane's phone as "Daddy," Wilkins's phone rang and displayed Detective Hernandez's phone number as the caller.

C.    *Electronic Evidence*.

Jane's testimony was consistent with messages and photos obtained from Wilkins's cellphone, Vaughn's cellphone, Jane's cellphone, Molly's cellphone, and Instagram.

1.    *Terms used in the messages*.

Police expert witnesses defined some of the terms used in these messages.  A sex buyer is called a "trick" (or "T"), a "John," or a "date."  "Trick" and "date" can also mean an exchange of sex for money.

A "P" is a pimp.  "Izm" means an individual pimp's pimping style.  To "fuck with you" (abbreviated "fwu") means to be in a pimp-prostitute relationship with the other

person.  A pimp calls a prostitute a "bitch"; a prostitute calls her own pimp "daddy" or "king."

"Trap," as a noun, means the daily dollar quota that a pimp sets for a prostitute. Thus, to "trap," as a verb, means to make money.  To "break" (or "brake") means to get money from someone; a prostitute will break a trick, and a pimp will break a prostitute.

Jane was White; Molly was Black.  "Snow" means a white prostitute.  "Faggot" or "fag" means "a prostitute that's not paying her pimp or otherwise not doing what she's supposed to."  "Tellys" means hotels.

Sometimes pimps work as partners, so they can split overhead expenses, such as travel and hotel rooms; they may or may not also split their income.  However, each prostitute will work for one particular pimp.

        2.     *The content of the messages and photos*.

The text messages show that during May 2018, Wilkins was trying to recruit Jane. He referred to himself as "[D]addy."  He said, "[I]ts our time baby let that corny shit in the past n let me do my job . . . ."  "[A]ll i need is 1 shot . . . ."  "[U]nderstand u Queen n have to boss up n stay bossed up."  "[J]ust make the move u wont regret it baby, get to know sum poloizm baby."  He said he could be having "[f]un" "if I was braking on you out here."  "[W]ell how about this u make money right you trappin n shit u in tellys n shit."  He asked her to meet with him, adding, "[W]e worth it."  When she apologized for wasting his time, he said, "[H]os [a]pologize with a bank role not texts."

8

On May 27, 2018, Jane told him, "I'm giving up on everything. Starting new and that's with u." "I'm blessed to be able to fwu . . . ." She sent him a photo of herself with a money bag superimposed over her face.

On June 1, 2018, Wilkins said, "[M]eet me somewhere or ill pick u up." Jane asked, "Where," and he said, "[M]otel 6 oakland."

On June 1, 2018, around 6:00 p.m., Jane indicated that she was at 21st and Shotwell, in San Francisco. She was being offered "30-40." He replied, "[T]ell em lets go to the bank." "[H]and job they ass." He ordered her, "[B]rake." She replied, "That's what I'm doin I'm getting stopped but I'm not gonna lowball . . . ." Later, she said, "This my last condom on me." On June 2, 2018, around 12:30 a.m., she asked him to come and get her; 15 minutes later, he said, "[I]m here."

Similarly, on June 1, 2018, around 5:00 p.m., Molly reported that she was at 19th and Shotwell. Wilkins coached her, telling here where to go and saying, "[H]ave a good nite with u sexy ass n we out of here." He ordered her to "brake a T." He told her to "meet up with snow."

On June 2, at 4:43 a.m., Vaughn told Wilkins, "If the black bitch acting funny, let me know let the how know you gone put her o. Wit a goooooddd nova and I'll work that situation." After that, Wilkins stopped texting Molly, and Vaughn started texting her.

On June 2, 2018, Wilkins and Vaughn booked rooms at a motel in Gardena. Vaughn texted someone that he was "[w]it my [p]imp [p]atna." Starting around

9

6:00 p.m., Wilkins sent messages coaching Jane: "[B]e aggressive." "[B]e in a T face u sexy bitch u." "[B]ust that la cherry hello." "Watch out for SUV pig."

Jane said she had a "[r]oom date" and needed "our room." When Wilkins accused her of "playing," she said, "I'm just tryna make u money daddy I'm sorry." He acquiesced, saying, "[L]et me know when u park." She reported, "He just wanna be slapped hella hard WHAT THE FUCK." "He's almost done." Later, she said, "I don't have anymore condoms." This series of messages ended on June 2, 2018 around 10:30 p.m., when Wilkins asked where she was.

They began messaging again on June 3, 2018, around 11:20 a.m. Jane said she was at 11th and Manhattan, in Los Angeles. Once again, he coached her, saying, "[D]ont just walk baby post up wave smile . . . ." Jane asked, "100 room?" Wilkins said, "[S]ay 150 130 120." Jane replied, "I said 140 . . . he showed me 100 an said that's all he had." She said, "About to pull up in a tiny ass truck." He said, "[D]oors open baby." She said, "Here an thank u daddy." He replied, "[A]nything for my bitch." Later, when she was back out on the street again, Wilkins told her, "Brake with yo sexy ass." This series of texts ended on June 4, 2018, around 12:20 a.m.

Meanwhile, also on June 3, 2018, Vaughn texted Molly, "How much u break for?" She said, "50." He replied, "Knocking that shit down." He told her, "[G]et one more date and we out." "Actually 360 more . . . and we gone . . . ." He ordered Molly to block Polo on her Instagram, adding, "And block the white bitch."

10

Meanwhile, still on June 3, 2018, around 1:30 p.m., Jane texted Molly that Wilkins had yelled at her. "I'm leaving. I'll figure sum out. I can't do this no more." Molly said, "Come with me." "Royal I mean he's not going to act like that." Molly reported to Vaughn, "He was yelling at her again." Vaughn replied, "Imma holla at my [p]atna tho."

On June 4, 2018, Jane and Wilkins exchanged texts between about 10:15 a.m. and 11:15 a.m., including texts indicating that Jane had started and finished a date. Likewise, Vaughn and Molly exchanged texts. He told her, "U my bitch." "I fuck wit u."

A video on Wilkins's phone showed him with "a stack of cash"; the background music was "P.I.M.P.," by 50 Cent.

D.     *Selena*.

Texts and photos on Wilkins's phone indicated that one Selena was a prostitute and he was acting as her pimp. For example, he said, "[P]s suppose to have his way n hes bitches suppose to believe in him period." "Y'all wanna ho, but want y'all nigga not to pimp. Sorry, fag, it don't work like that."

On Wilkins's phone, there were photos of Selena, both unedited and edited (i.e., with superimposed writing); the phone also had an app that could be used to superimpose writing. The edited photos had been posted in online prostitution advertisements.

Selena had a "POLOIZM" tattoo. A search of Wilkins's car turned up clothing belonging to Selena.

11

E.    *Ebony*.

Texts and photos on Wilkins's phone indicated that one Ebony was a prostitute and he was acting as her pimp. He had saved her number on his phone as "$ new," meaning "new money." He told her, "be assertive be aggressive." She replied, "No its just that they only have 40 dollars, want me to have a room with only 60 to offer, or they're just passing me up for the white hoes." He said, "[H]and jobs 4 40." "80 to 100 for room . . . ." "[S]omething is better then nothing just brake."

F.    *Prior Convictions*.

1.    *Vaughn*.

In 2006, in San Joaquin County, Vaughn pleaded guilty to pandering.

In 2010, Vaughn pleaded guilty in federal court in California to four counts of sex trafficking of a minor. (18 U.S.C. § 1591(a)(1).) As part of the plea, he admitted recruiting two 14-year-olds, a 15-year-old, and a 16-year-old to work for him as prostitutes.

In 2017, in Sonoma County, Vaughn pleaded guilty to two counts of aiding prostitution (§ 653.23, subd. (a)) and one count of second degree burglary (§ 459).

This conviction arose from an incident in November 2016. Police officers arrested a prostitute in her motel room. A consent search of her cellphone showed texts between her and "Royal."

When Vaughn showed up at the motel room, he was arrested. A search of his phone showed that he identified himself as "Royal." There were over 1,100 messages

12

between him and the prostitute.  These showed that he was acting as her pimp.  For example, she told him when she had a date and how much she was charging; sometimes, he told her how much to charge.  When she said she was tired and hungry, he replied, "[G]o play the blade and get one more date."

The prostitute sent Vaughn photos of herself to be used in ads.  Several of these had then been posted in her ad on Backpage.

2.      *Wilkins*.

In 2013, in San Diego County, Wilkins pleaded guilty to conspiracy to commit prostitution (§ 182, subd. (a)(1)) and loitering with the intent to procure prostitution (§ 653.22, subd. (a)), both misdemeanors.

These convictions arose out of an incident involving a prostitute called Problemms.  Problemms testified at trial, but she was a reluctant witness.  She admitted that she was a prostitute, but she testified that Wilkins was not her pimp; he was her boyfriend.  He drove her to a hotel for date with a prospective customer; according to Problemms, however, she told him falsely that she was going "[t]o visit a friend."  When they arrived at the hotel, Problemms was arrested.

Texts and photos on Wilkins's phone indicated that Problemms was a prostitute and he was still acting as her pimp as late as January 2017.  She had a tattoo that said, "POLO wid da izm."

13

G.      *The Defense.*

    1.      *Character witnesses.*

        a.      *Wilkins.*

Wilkins called three character witnesses.

A friend of Wilkins's mother testified that she had known Wilkins for four or five years. She had never known him to be disrespectful or abusive to women.

Wilkins's older brother testified that Wilkins was "very respectful to women." Wilkins was his mother's primary caretaker, paid by the state. However, he did go away from home for days at a time, sometimes as much as a week or two weeks, for "gambling, poker events, Vegas." When his mother had cancer surgery, Wilkins was away at a poker tournament.

Wilkins had been "disrespectful" to his mother "through arguments and whatnot." He had gotten into "heated" arguments with her. After one such argument, the brother phoned Wilkins and "yell[ed] and scream[ed] at him for the way he was treating [their] mother."

Wilkins's mother testified that she had seen him be both respectful and disrespectful to women. He was "helpful and caring." He had "helped several . . . prostitutes get off the streets." Since 2008, he had been her state-paid care provider. He also worked as an Uber driver. She admitted that, when she went to the hospital for surgery, Wilkins did not go with her.

14

In texts sent in March 2018, Wilkins told his mother, "That hanging up shit is fucking corny and stupid as fuck." She replied that he had been "cussing" at her when she was "trying to help." He told her, "Leave me the fuck alone."

In May 2018, Wilkins's 10-year-old daughter called 911, saying "her dad was being physical with her grandmother[.]" Wilkins "took off" before the police arrived. In a subsequent text, his mother accused him of having pushed her. She called him "a pathetic piece of shit"; she added, "When [you] decide to come here for your shit, bring a police escort."

> b. *Vaughn*.

Vaughn called one character witness, his uncle. The uncle testified that Vaughn worked for him, building fences and doing yard work. Vaughn also worked for others, doing odd jobs, such as installing fiber optic lines and working on a chicken farm.

> 2. *Wilkins's Testimony*.

Wilkins took the stand and denied being a pimp. While Jane was with him, she engaged in prostitution on her own. However, he admitted telling her what to charge.

He denied knowing Ebony. He could not explain why he was telling her what to charge for room dates and hand jobs.

Wilkins testified that he lived with his mother and his daughter. He was a professional poker player. He also worked as an Uber driver and as his mother's caregiver.

15

He wanted to be a professional rap musician.  He had given live performances; he had put out an album and a single.  His work was available on Spotify, Amazon, iTunes, YouTube, and SoundCloud.  His "artist name" was "POLO Junky," because he liked clothing by Polo Ralph Lauren.

He specialized in "pimp-hop music."  Thus, his song lyrics referred to pimping.  As part of his self-promotion, he posted pimping-related memes.  To him, "izm" meant wisdom.

On Tagged, Jane's listing said she was 20.  She also told Wilkins that she was 20.

On June 1, 2018, Jane phoned Wilkins and said she had been beaten up.  He told her to meet him at the Jack in the Box.  When he arrived, Molly was there, too.  He bought them food and brought them back to his room at a Motel 6.  He was not staying at home because he had had a fight with his mother.

The girls wanted to go to San Francisco, so he drove them there.  They stopped at a gas station, then went back to Oakland.  On the way, they picked up Vaughn.  They all stayed overnight at a hotel.

Wilkins and Vaughn decided to go to Los Angeles; the girls went with them.  Then they went to San Bernardino, so Wilkins could go to a "pop-up shop" offering discount marijuana.  When the police arrived, he flushed the marijuana he had bought.

The $900 that he had when he was arrested was what was left of the $1,500 he had gotten from his mother.

He had prostitution ads on his cellphone, featuring Selena and Ebony, either because the photos were sent to him or because he took screenshots of them.

## II

## STATEMENT OF THE CASE

In a jury trial, Vaughn was found guilty:

(1)  With respect to Jane, of human trafficking of a minor (§ 236.1, subd. (c)(1)), with an enhancement for a prior human trafficking conviction (§ 236.4, subd. (c)); and pimping a minor 16 or older (§ 266h, subd. (b)(1)).

(2)  With respect to Molly, of pimping (§ 266h, subd. (a)) and pandering (§ 266i, subd. (a)(1)).

Wilkins was found guilty:

(1)  With respect to Jane, of human trafficking of a minor, pimping of a minor 16 or older, and pandering of a minor 16 or older (§ 266i, subd. (b)(1)).

(2)  With respect to Molly, of pimping and pandering.

(3)  With respect to Selena, of pandering.

(4)  With respect to Ebony, of attempted pimping (§§ 266h, subd. (a), 664) and pandering.

Vaughn was sentenced to a total of 19 years 8 months in prison.  Wilkins was sentenced to a total of 18 years in prison.

17

III

VENUE

Defendants contend that San Bernardino County was not the proper venue for some counts.  The People respond that defendants forfeited this contention.

A.     *Additional Procedural Background*.

The information alleged that all of the counts were committed in San Bernardino County.

Defendants moved to set aside the information.  (§ 995.)  In the motion, they argued that there was insufficient evidence of certain counts.  However, they also argued, citing the general criminal venue statute (§ 777), that the prosecution had introduced insufficient evidence at the preliminary hearing that any of the crimes were committed in San Bernardino County.  The prosecution did not file an opposition.

The trial court denied the motion.  Its ruling did not expressly address the venue issue.  Defendants did not file a writ petition seeking review of this ruling.

B.     *Forfeiture*.

A California court has subject matter jurisdiction to try any crime committed in California.  (*People v. Simon* (2001) 25 Cal.4th 1082, 1096.)  Regrettably, some California statutes use the phrase "jurisdictional territory" to refer to venue.  (E.g., § 691, subd. (b).)  However, "'"[v]enue is not jurisdictional in the fundamental sense . . . ."'" [Citation.]"  (*People v. Peoples* (2016) 62 Cal.4th 718, 791, italics omitted.)

As a general rule, under section 777, the proper venue for trial is the county in which the crime was committed. (See also § 691, subd. (b).) This general rule, however, is subject to assorted statutory exceptions.

One such exception applies to a prosecution for human trafficking, pimping or pandering. Section 784.7, subdivision (c) provides: "If more than one violation of Section 236.1, 266h, or 266i occurs in more than one jurisdictional territory, the jurisdiction of any of those offenses, and for any offenses properly joinable with that offense, is in any jurisdiction where at least one of the offenses occurred, subject to a hearing pursuant to Section 954 . . . . At the Section 954 hearing, the prosecution shall present written evidence that all district attorneys in counties with jurisdiction of the offenses agree to the venue. Charged offenses from jurisdictions where there is not a written agreement from the district attorney shall be returned to that jurisdiction."

"'[A] defendant . . . forfeits a claim of improper venue when he or she fails specifically to raise such an objection prior to the commencement of trial.' [Citation.]" (*People v. Posey* (2004) 32 Cal.4th 193, 200.)

"[I]n felony proceedings a claim of improper venue properly may be raised by demurrer (if the defect in venue appears on the face of the accusatory pleading), by a challenge to venue specifically raised before the magistrate at the preliminary hearing, or by a motion under section 995 challenging the validity of an indictment or information. [Citations.]" (*People v. Simon*, *supra*, 25 Cal.4th at pp. 1106-1107.)

Here, defendants specifically raised an improper venue claim in their section 995 motion. The People fault the motion because it cited only section 777; it did not cite section 784.7, and it did not argue that section 784.7 did not apply. The information, however, alleged — evidently pursuant to section 777 — that each crime was committed in San Bernardino County. Defendants quite properly argued that the evidence at the preliminary hearing did not support these allegations. "The prosecution has the burden of proving the facts supporting venue by a preponderance of the evidence . . . .' [Citation.]" (*People v. Thomas* (2012) 53 Cal.4th 1276, 1283.) Defendants had no burden other than to raise the issue and put the prosecution to its proof.

The People also argue that defendants forfeited the issue by failing to file a prompt writ petition.

Certainly defendants *could* have filed a writ petition. They could readily have shown that an appeal would not be an adequate remedy, because it would bring them relief, if at all, only after the anxiety, effort, and expense of a trial that would then have to be repeated elsewhere. However, this does not mean that they *had to* file a writ petition.

As a general rule, the erroneous denial of a section 995 motion can be raised by way of a writ petition. (§ 999a.) As here, an appeal is not an adequate remedy, because it is available only after the defendant has endured a potentially improper trial. Nevertheless, the issue can also be raised on appeal. (*People v. Flores* (1974) 12 Cal.3d 85, 89, fn. 2.)

20

Similarly, an order denying a change of venue can be challenged in either a pretrial writ proceeding or a posttrial appeal, at the defendant's option. (*People v. Tidwell* (1970) 3 Cal.3d 62, 68 ["defendant's failure to seek review by mandate prior to his trial in no way limits his right to relief" on appeal].) This is true even though a writ petition is the only way to prevent the trial from occurring in the wrong place.

The People cite *People v. Betts* (2005) 34 Cal.4th 1039, which held that whether a California court has subject matter jurisdiction to try a crime committed, at least in part, in another state must be raised before trial. (*Id*. at pp. 1046-1054.) As relevant here, it said: "' . . . If only a jury could determine subject matter jurisdiction, a defendant would always be put through the expense, anxiety, and uncertainty of a trial and the only mechanism to challenge jurisdiction would be an appeal after the conclusion of trial.' By contrast, if the issue can be resolved by the court before trial, *the defendant will have the opportunity to seek immediate review through a writ proceeding*." (*Id*. at pp. 1051-1052, italics added.)

*Betts* does not apply here directly, because it involved subject matter jurisdiction rather than venue (although it recognized that the two can be analogous, *People v. Betts*, *supra*, 34 Cal.4th at p. 1051). More to the point, however, it did not say that the defendant could seek review *only* through a writ petition. It merely said a defendant has "the opportunity" to seek review through a writ petition, and will typically prefer to do so.

*People v. Simon*, *supra*, 25 Cal.4th 1082 provides somewhat stronger support for the People's position. There, the Supreme Court held that an objection to venue must be raised before trial. (*Id*. at pp. 1107-1108.) It explained — in part — that "the right to be tried in a statutorily designated venue is intended, from the perspective of an accused, as a safeguard against being required to stand trial in an unrelated and potentially burdensome distant location. This protection can be meaningfully afforded to a defendant only if he or she objects to venue *before* being required to proceed to trial in the allegedly improper locale. If a defendant's timely challenge to venue is sustained, the trial can be conducted in the proper location, before the parties, the witnesses, and the court have incurred the burden and expense of a trial in an unauthorized venue." (*Id*. at pp. 1103-1104.)

It is arguable that, for the same reasons, the denial of an objection to venue must be reviewed, if at all, before trial. However, that argument is flawed. The fact that a pretrial objection to venue is necessary to prevent a trial in the wrong place was not the only reason the Supreme Court gave for its holding in *Simon*. It also noted that: (1) in analogous situations — i.e., misdemeanor prosecutions and civil actions — there are statutes that require an objection to venue to be made before trial (*People v. Simon*, *supra*, 25 Cal.4th at pp. 1101-1103); and (2) allowing the defendant to object to venue during trial or for the first time on appeal would enable "'sandbagging.'" (*Id*. at p. 1004.)

There are no similar concerns here. As already discussed, in analogous situations — the denial of a section 995 motion or the denial of a motion to change venue — a writ

petition is not required. Moreover, under *Simon* itself, the defendant is required to object to venue before trial. Thus, no sandbagging is possible; if, as here, the prosecution insists on going to trial in the challenged venue, it knowingly takes the risk that the conviction may be reversed on appeal as a result.

We therefore conclude that defendants have not forfeited their contention that the venue for most counts was improper.

C.     *Prejudice*.

The fact that defendants have raised their venue challenge on appeal, rather than by writ, does have one crucial consequence. If they had raised the issue by writ, they would not have had to show prejudice. Because they raised it on appeal, however, they must. (See *People v. Mena* (2012) 54 Cal.4th 146, 156 [erroneous denial of motion to suppress must be shown to be prejudicial if raised on appeal, though not if by writ]; *People v. Vasquez* (2006) 39 Cal.4th 47, 68-69 [erroneous denial of motion to recuse prosecutor must be shown to be prejudicial if raised on appeal, though not if by writ]; *People v. Epps* (2001) 25 Cal.4th 19, 30 [erroneous denial of a jury trial must be shown to be prejudicial if raised on appeal, though not if by writ]; *People v. Martinez* (2000) 22 Cal.4th 750, 769 [erroneous denial of motion to dismiss based on violation of statutory right to a speedy trial must be shown to be prejudicial if raised on appeal, though not if by writ]; *People v. Williams* (1989) 48 Cal.3d 1112, 1125-1126 [erroneous denial of motion for change of venue must be shown to be prejudicial if raised on appeal, though not if by writ]; see generally Cal. Const., art. VI, § 13; § 1258.)

23

Defendants assert that a judgment entered in the wrong venue is "void." Not so. As already noted, the Supreme Court has held that venue is not jurisdictional in the fundamental sense. Defendants cite *People v. Betts*, *supra*, 34 Cal.4th 1039. We repeat, however, that *Betts* dealt with subject matter jurisdiction, not venue. They also cite *Taliaferro v. County of Contra Costa* (1960) 182 Cal.App.2d 587. However, the only discussion of voidness in that case related to the limited jurisdiction of municipal courts. (*Id*. at p. 591.) If it could be read any more broadly, it would conflict with the Supreme Court's subsequent holdings.

Accordingly, defendants must show that holding the trial in an improper venue was prejudicial under the state constitutional harmless error standard — i.e., that it is reasonably probable that, in the absence of the error, they would have enjoyed a more favorable result. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) This they cannot do. The mere fact that they were tried in the wrong place is not necessarily prejudicial. Indeed, as they argue that the charged acts took place in some six or seven different counties, arguably they benefited from having all of the counts tried in one place.

Defendants therefore assert that a trial in an improper venue violates their federal constitutional rights under the vicinage clause of the Sixth Amendment. Apparently their point is that the error is subject to the higher, "beyond a reasonable doubt" federal harmless error standard.

We may assume, without deciding, that defendants' venue objection was sufficient to preserve their present vicinage contention. Even if so, our Supreme Court has held

24

that the federal vicinage clause does not apply to the states.  (*Price v. Superior Court* (2001) 25 Cal.4th 1046, 1065.)  And, as defendants concede, the United States Supreme Court has never held otherwise.

Defendants protest that "the rule of stare decisis only applies where a state statute or provision of the state Constitution is at issue."  Again, not so.  "[I]n the absence of a subsequent contrary decision of the United States Supreme Court, we are bound by the California Supreme Court's holding on [an] issue of federal law . . . ."  (*Tanguilig v. Bloomingdale's, Inc.* (2016) 5 Cal.App.5th 665, 673.)

While there is a corresponding vicinage right under the state Constitution (Cal. Const., art. I, § 16; *People v. Hill* (1992) 3 Cal.4th 959, 984, overruled on other grounds in *Price v. Superior Court*, *supra*, 25 Cal.4th at p. 1069, fn. 13), the violation of a state constitutional right does not require reversal unless the defendant can show prejudice.  (Cal. Const., art. VI, § 13.)  As already discussed, defendants cannot.

Finally, defendants argue that the prosecution's violation of the venue statutes — and, in particular, its failure to comply with the procedural requirements of section 784.7 — necessarily violated due process.  However, a "'mere error of state law' is not a denial of due process.  [Citation.]  If the contrary were true, then 'every erroneous decision by a state court on state law would come [the United States Supreme Court] as a federal constitutional question.'  [Citations.]"  (*Engle v. Isaac* (1982) 456 U.S. 107, 121, fn. 21.)  As defendants cannot even show prejudice, a fortiori they cannot show that the trial was fundamentally unfair so as to violate due process.

IV

SEVERANCE

Defendants contend that the trial court erred by denying their motions for severance.

A.    *Additional Factual and Procedural Background.*

Before the preliminary hearing, Wilkins filed a motion to sever his trial from Vaughn's. He argued that that Vaughn had a "disreputable character," as would be shown by his prior "bad acts" and prior convictions.

Before trial, Wilkins filed a motion in limine renewing his motion to sever.[4] He argued that he and Vaughn had antagonistic defenses, in that each would point the finger at the other. He also argued, again, that he would be prejudiced by evidence of Vaughn's prior "bad acts" and prior convictions.[5]

Vaughn joined in Wilkins's motion in limine, though he did not explain how he would be prejudiced by joinder.

---

[4]    Wilkins asserts that this motion was "based on testimony at the preliminary hearing." However, it did not discuss any of that testimony, and Wilkins's counsel did not ask the trial court to review the preliminary hearing transcript.

[5]    Wilkins also argued that severance was necessary because otherwise, Vaughn's out-of-court statements would be introduced at his trial, in violation of the confrontation clause, as construed in *Bruton v. United States* (1968) 391 U.S. 123, 137. He does not repeat this argument on appeal. It lacks merit. Vaughn's out-of-court statements were not testimonial. Therefore, their admission could not violate the confrontation clause. (*People v. Almeda* (2018) 19 Cal.App.5th 346, 362-363.)

26

The trial court denied the motion. It said: "We have identical crimes. We have nearly identical priors." "[B]oth defendants have very strong, in fact, overwhelming evidence against them independently such that I think it is not to have a spillover effect on the codefendant." "Additionally, we are talking about a single course of conduct in this case. Jane Doe is the same Jane Doe for both defendants. The streets, the city, the date, the time, the place, the travel, to and from the bay area, those are all identical facts with identical witnesses."

At trial, before the evidence of Vaughn's prior convictions was introduced, the trial court instructed the jury: "There are going to be some things in this trial that only apply to one defendant and not the other. This is one of those instances. . . . Things that are specific to one defendant cannot be used in your deliberations in any way towards another defendant, unless you are specifically told that it does."

Similarly, throughout the trial, whenever defendants so requested, the trial court instructed the jury that certain evidence was to be considered only against one or the other defendant.

At the end of the trial, the trial court instructed:

"You must separately consider the evidence as it relates to each defendant." (CALCRIM No. 203.)

"I instructed you during the trial that certain evidence was admitted only against a certain defendant. You must not consider that evidence against any other defendant." (CALCRIM No. 304.)

27

"The People presented evidence that defendant Wilkins committed other offenses of pimping, pandering, and loitering to commit prostitution that were not charged in this case.

"The People presented evidence that defendant Vaughn committed other offenses of sex trafficking of children, pimping, pandering, and aiding prostitution that were not charged in this case.

"You may consider this evidence only against the particular defendant associated with the prior offenses . . . ."  (CALCRIM No. 375.)

It added that the jury could consider these other offenses only with regard to intent, motive, knowledge, and absence of mistake or accident.

B.      *Discussion*.

1.      *Legal background*.

Section 1098 provides, in part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials."

"This provision indicates the Legislature's 'strong preference for joint trials.' [Citation.]"  (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 596.)  "'Joint trials "play a vital role in the criminal justice system"' because they 'promote efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."' [Citation.]"  (*Ibid*.)  "' . . . Joint trial may enable a jury "to arrive more reliably at its

conclusions regarding the guilt or innocence of a particular defendant. . . .'" [Citations.]" (*Ibid.*)

"'When defendants are charged with having committed "common crimes involving common events and victims," as here, the court is presented with a "'classic case'" for a joint trial.' [Citation.]" (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 819.)

"[W]hen defendants are properly joined, severance should be granted 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' [Citations.]" (*People v. Beck and Cruz*, *supra*, 8 Cal.5th at p. 596.)

"'We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared at the time the court ruled on the motion.' [Citation.] (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 242.) "Denial of a motion for severance amounts to a prejudicial abuse of discretion if the trial court's ruling falls outside the bounds of reason. [Citation.]" (*People v. Hartsch* (2010) 49 Cal.4th 472, 493.)

"'[E]ven if a trial court's severance or joinder ruling is correct at the time it was made, a reviewing court must reverse the judgment if the "defendant shows that joinder

actually resulted in 'gross unfairness' amounting to a denial of due process.'"

[Citation.]" (*People v. Gomez* (2018) 6 Cal.5th 243, 274.)[6]

       2.    *Wilkins's arguments.*

Wilkins argues, as he did below, that the evidence of Vaughn's prior convictions was prejudicial as to him. The trial court could reasonably find no serious risk of substantial prejudice, for three reasons. First, Wilkins had a prostitution-related prior conviction of his own. He argues that Vaughn's prior conviction for sex trafficking of a minor was particularly prejudicial, because it was the same as the most serious offense charged in this case. Nevertheless, on this record, which showed overwhelmingly that Wilkins committed pimping, pandering, and human trafficking of Jane, who was a minor,[7] there is no reason to suppose that the fact that Vaughn had a more serious prior conviction than Wilkins affected the verdict.

Second, to the extent that Vaughn's criminal record was more serious, that could cut both ways. It could be argued that it made Wilkins look less dangerous, less blameworthy, and/or less in control of their joint criminal enterprise than Vaughn.

---

    **6**    We question the wisdom of this rule. It would seem that, if a defendant believes it has become apparent during trial that joinder has become prejudicial, that defendant should be required to make a motion for a mistrial. That way, the trial court can be given an opportunity to evaluate the claim, in the context of its observations, and, if it agrees, to grant a mistrial and obviate the necessity of an appeal.

    Our Supreme Court has spoken, however, and we must obey.

    **7**    When Wilkins committed pandering of Selena, she was 17. Thus, the evidence showed that he had committed human trafficking of a minor as to her, too, although he was not charged with it.

Third, the trial court instructed the jury to consider Vaughn's prior convictions solely with respect to Vaughn. "We presume the jury understood and followed these instructions. [Citation.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1178, disapproved on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) We see no reason why the jury would not have been able to do so here. Such "limiting instructions . . . '"often will suffice to cure any risk of prejudice."'" [Citation.]" (*People v. Silveria and Travis*, *supra*, 10 Cal.5th at p. 243.)

Wilkins also argues that the case against him was weak: Jane had admittedly told some lies to the police, and evidently she had "an odd demeanor" on the stand; Molly, Selena, and Ebony did not testify; and the numerous texts were supposedly "incoherent." We could not disagree more. The evidence against Wilkins was overwhelming, especially because so much of it came from his own cellphone. The prosecution walked the jury slowly and methodically through the texts and photos (including photos of Molly, Selena, and Ebony) on the cellphone. Largely, the texts and photos spoke for themselves; nevertheless, police expert witnesses explained them, just in case. On this record, it is inconceivable that Vaughn's prior convictions had any influence whatsoever on the jury's verdicts against Wilkins.

### 3. *Vaughn's arguments*.

Although Vaughn joined in Wilkins's motion to sever, he did not explain how, in his view, he would be prejudiced by joinder. (Cf. *People v. Nero* (2010) 181 Cal.App.4th 504, 510 [party who joins in another party's appellate brief must separately demonstrate

error and prejudice].) At that point, Wilkins was arguing that *he* would be prejudiced by a joint trial with *Vaughn*. It was not immediately apparent why the reverse might be true. Accordingly, the trial court did not abuse its discretion by denying the motion with respect to Vaughn.

Having made the motion, however, Vaughn can still argue that, in hindsight, joinder resulted in gross unfairness amounting to a denial of due process.

Vaughn notes that Wilkins was charged in three counts with crimes against two additional victims, Selena and Ebony, and therefore the jury heard evidence of these additional offenses. Precisely because Vaughn was not charged with those crimes, however, and was not shown to have been involved in them, this evidence was not prejudicial. If anything, it tended to show that, at least sometimes, Wilkins operated independently of Vaughn and they were *not* "pimp partners."

Vaughn claims that the trial court did not give a limiting instruction regarding the evidence involving Selena and Ebony. That is incorrect. It instructed: "You must separately consider the evidence as it relates to each defendant." (CALCRIM No. 203.) If Vaughn wanted an instruction specifically tailored to the evidence involving Selena and Ebony, he could have requested one. His failure to do so suggests he did not think the instruction was inadequate and did not think that the evidence prejudiced him.

Vaughn also notes that the jury heard about Wilkins's prior conviction. As Wilkins argues, however (see part IV.B.2, *ante*), Vaughn himself had more and worse prior convictions.

32

Next, Vaughn notes, there was evidence showing Wilkins's bad character. Wilkins had written rap lyrics that revolved around pimping, prostitution, and violence. When Wilkins's mother testified as a character witness, the prosecutor introduced evidence that he verbally abused her and pushed her. There was also evidence that Wilkins knocked out two of Selena's teeth (although it was an accident, he felt bad about it, and he tried to arrange dental care for her).

In the context of the overall trial, this evidence was little more than a blip. These three incidents were not even significant enough for defendants (or the prosecution) to mention them in their statements of facts on appeal. Given the massive evidence that both Wilkins and Vaughn actually were pimps, they would not have loomed large in the jury's mind.

Finally, Vaughn points out that Wilkins made a poor showing on the stand especially on cross-examination. He persisted in denying that he was a pimp, despite massive evidence that he was. The trial court observed, for the record, that when his rap music was played, Wilkins was "dancing, bobbing his head, singing along, smiling, trying to make eye contact with everyone as if he were performing." The trial court found this "wholly, wholly, inappropriate, disrespectful, a complete mockery of the justice system as a whole."

Vaughn, however, was also inappropriate and disrespectful. The trial court further noted, for the record: "[B]oth defendants have been talking pretty much nonstop since day one, jury selection, talking to each other, hissing, laughing, . . . making comments,

33

saying that's not true.  I would say there's probably been 1 to 5 percent of the trial where they were not speaking.  [¶]  But really it's been an ongoing diatribe from both defendants to each other about witnesses, out loud, the jury can certainly hear them. . . .  I think it's working to their disadvantage.  I am sure the jurors are very frustrated and think they are snide and not taking this seriously, extraordinarily disrespectful to the jurors, to the Court, to the witnesses."

Vaughn cites *People v. Chambers* (1964) 231 Cal.App.2d 23.  There, Chambers, the owner of a rest home, and Spitler, the supervising nurse, were tried jointly.  Chambers was charged with assault on a patient; Spitler was charged with three different assaults on the same patient.  (*Id*. at pp. 24-25.)  The testimony against Chambers came from one witness, "occupie[d] only three pages of the reporter's transcript," and was uncorroborated by any bruises or marks on the patient.  (*Id*. at p. 25.)  "The rest of the evidence introduced during the three-day trial was directed against Mrs. Spitler alone." (*Id*. at p. 26.)  It showed that she had committed numerous assaults against patients over six or seven years.  (*Ibid*.)

The appellate court rejected both defendants' actual contentions.  (*People v. Chambers*, *supra*, 231 Cal.App.2d at pp. 27-28.)  However, it said:  "[W]e find ourselves in an unusual situation, characterized by a paucity of error technically available for appellate review, but emphatically demanding defendant's retrial under better circumstances."  (*Id*. at p. 27.)  It then held, sua sponte, that the joinder of Chambers and Spitler — when combined with various aggravating circumstances of the trial (*id*. at

pp. 27-28) — resulted in a violation of due process. (*Id*. at pp. 28-34.) It concluded that Chambers was found guilty on a theory of "[g]uilt by association." (*Id*. at p. 28.)

This case could hardly be more different from *Chambers*. There was ample evidence of Vaughn's guilt, as well as ample evidence that he was actively working together with Wilkins, as "pimp partners." There is no indication in the record that Vaughn was convicted a on theory of guilt by association.

V

WARRANTLESS ENTRY AND SEARCH OF WILKINS'S MOTEL ROOM

Wilkins contends that the trial court erred by denying his motion to suppress the evidence obtained as a result of a warrantless entry into and search of his motel room.

A.      *Additional Factual Background*.

The evidence at the preliminary hearing showed the following.

On June 4, 2018, one Sergeant Oldendorf went to an area known for prostitution in response to a report of indecent exposure. He saw Jane talking to an apparent "sex buyer" in a car. She was wearing a see-through net blouse that exposed her breasts.

He detained Jane. She admitted being a minor. Among her possessions were a cellphone and a keycard to room 112 of the Econo Lodge.

During their conversation, a Black female in a pink dress walked by at least twice. Jane pointed to her and identified her as Molly, "the girl she came to San Bernardino with."

Detective Kimberly Hernandez, a member of a human trafficking task force, was on call that evening. At 6:08 p.m., Sergeant Oldendorf phoned her and told her that he had detained a minor apparently engaged in prostitution.

Detective Hernandez arrived at the police station at 7:00 p.m. Sergeant Oldendorf gave her "a rundown on the circumstances" and gave her the keycard.

Detective Hernandez spoke to the owner of the Econo Lodge. He said room 109 was registered to Vaughn, and room 112 was registered to Wilkins. They had arrived together in a red Ford Edge with Florida license plates and had checked in around 3:00 p.m. that day.

Detective Hernandez contacted her supervisor, Sergeant Michael O'Brien, and asked for other officers to assist her. She conducted criminal record checks on defendants, which showed that Vaughn was on parole. She also obtained photos of defendants. She examined Jane's cellphone and found a text message to Jane saying, "This Molly. You good?"

Deputies "looked around" for Molly in the area where Jane was arrested but did not find her.

The owner of the Econo Lodge phoned Detective Hernandez and told her that defendants had returned to the motel. At Detective Hernandez's request, Deputy Gerard Deloria went to the Econo Lodge, took down the license plate number of a red Ford Edge with Florida license plates, and returned to the station.

36

Around 7:45 or 8:00 p.m., Detective Hernandez started interviewing Jane. Jane said again that she was a minor. She said she was from the Oakland area. She had been working as a prostitute in Northern California and was currently working as prostitute in San Bernardino.

Detective Hernandez showed Jane the photo of Wilkins, but she denied knowing him. She claimed her pimp was DeeTee; DeeTee and Vaughn had brought her and Molly to San Bernardino, in a red Ford Edge. They had checked into the Econo Lodge that day at about 3:00 p.m.

Detective Hernandez did not believe Jane when she identified her pimp as DeeTee. Prostitutes commonly try to protect their current pimp by giving information about a previous pimp.

Detective Hernandez asked Jane how old Molly was. Jane said "Molly told her that she was 20, but she could have been younger because [Jane] knows that sometimes people lie about their age."

Around 9:00 p.m., during a break in the interview, Detective Hernandez briefed Sergeant O'Brien and Deputy Deloria. She asked them to go to the Econo Lodge, "to make contact to see if there w[ere] any additional victims, including Molly,[8] that may

---

**8**    Specifically, Detective Hernandez told them "that there may be two additional victims of human trafficking, one of them a juvenile." There was no evidence at the preliminary hearing as to why she thought there might be a third victim in addition to Jane and Molly.

possibly be at the motel." She described the suspects and the victims. She gave Deputy Deloria the keycard to room 112.

At 10:15 p.m., Sergeant O'Brien, Deputy Deloria, and other members of the human trafficking task force arrived at the Econo Lodge. They knocked repeatedly on the door of room 112 and announced that they were police officers. There was no response.

Deputy Deloria tried using the keycard. The light in the lock flashed red. He knew from experience that this meant the door was locked from inside. He talked to the motel manager and confirmed that he had the right keycard for room 112. Meanwhile, Sergeant O'Brien put his ear to the door and heard "shuffling, like a movement inside."

Sergeant O'Brien and Deputy Deloria decided "to force entry to ensure that the possible . . . juvenile victim[] was okay and not being held hostage." They got a ram from a patrol car and used it to break down the door.

Wilkins was the only person in the room. Deputy Deloria detained him and handcuffed him.

A search of Wilkins's person turned up his cellphone. A search of the room turned up clothing that belonged to Jane as well as condoms.

Three or four minutes after entering the room, Sergeant O'Brien asked Wilkins if he could look inside his vehicle. Wilkins said he had "no issue" with that. A search of the vehicle turned up women's clothing. Wilkins gave a Mirandized statement.

Meanwhile, Deputy Deloria, aware that Vaughn was on parole, knocked on the door of room 109. Vaughn opened it; Deputy Deloria entered. A search of the room turned up more women's clothing, in a different size, and Vaughn's cellphone.

B.     *Additional Procedural Background.*

Before the preliminary hearing, Wilkins filed a motion to suppress all evidence obtained as a result of the warrantless search of his motel room, arrest, and search of his car.[9] (§ 1538.5, subds. (a), (f).)

The prosecution filed an opposition. It argued, among other things, that the entry was justified by exigent circumstances, namely "to ascertain whether . . . any . . . minor human trafficking victims were inside the room and potentially in harm[']s way." It also argued that Wilkins consented to the search of his car.

The motion was heard concurrently with the preliminary hearing. At the end of the hearing, the magistrate denied the motion. He explained that the officers had a reasonable suspicion that Molly was a minor engaged in prostitution. "It's very reasonable to think she may have actually been in a motel room engaging in acts of prostitution. . . . A minor engaging in prostitution is [in] a situation that puts her health, welfare and safety in danger."

---

[9]     Vaughn joined in the motion. As to Vaughn and Room 109, however, the motion was denied on a different ground — that he was on parole, with a search condition. As to Wilkins and Room 112, Vaughn lacked standing. Thus, Vaughn does not join in Wilkins's contention on appeal.

Wilkins renewed his motion in the trial court before trial, based on the preliminary hearing transcript. (§ 1538.5, subd. (i).) The trial court, too, denied the motion. It commented, "[T]he opposite extreme is what if the officers would have said we think this is two men trafficking two minors up and down the State of California . . . for purposes of sex trade? We think it is going on in rooms 1[09] and 112 and we're going to make sure that all our t's are crossed, all our i's are dotted. We are going to write a warrant, have it reviewed by our supervisor. We are going to try to find a [j]udge . . . . [¶] I think society would be righteously outraged."

C. *Discussion*.

"A defendant may move to suppress evidence under section 1538.5 on grounds that a search without a warrant was unreasonable. A warrantless search is presumptively unreasonable, and the prosecution bears the burden of demonstrating a legal justification for the search. [Citation.]" (*People v. Simon* (2016) 1 Cal.5th 98, 120.)

"Nevertheless, . . . the warrant requirement is subject to certain exceptions. [Citations.]" (*Brigham City v. Stuart* (2006) 547 U.S. 398, 403.) The United States Supreme Court has "long recognized an exigent-circumstances exception to the warrant requirement in the Fourth Amendment context. [Citations.] [It has] found the warrant requirement of the Fourth Amendment inapplicable in cases where the '"exigencies of the situation" make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.' [Citation.]" (*New York v. Quarles* (1984) 467 U.S. 649, 653, fn. 3.)

"The exception enables law enforcement officers to handle 'emergenc[ies]' — situations presenting a 'compelling need for official action and no time to secure a warrant.' [Citations.] . . . An officer, for example, may 'enter a home without a warrant to render emergency assistance to an injured occupant[,] to protect an occupant from imminent injury,' or to ensure his own safety. [Citations.] So too, the police may make a warrantless entry to 'prevent the imminent destruction of evidence' or to 'prevent a suspect's escape.' [Citations.]" (*Lange v. California* (2021) ___ U.S. ___, ___ [141 S.Ct. 2011, 2017-2018].)

"The '"emergency aid exception"' to the warrant requirement 'does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises.' [Citation.] Rather, the exception 'requires only "an objectively reasonable basis for believing . . . " [citation] that "a person within [the house] is in need of immediate aid."' [Citation.]" (*People v. Troyer* (2011) 51 Cal.4th 599, 605.)

"In reviewing a trial court's ruling on a motion to suppress, we defer to the trial court's factual findings, express or implied, where supported by substantial evidence. [Citation.] And in determining whether, on the facts so found, the search was reasonable for purposes of the Fourth Amendment to the United States Constitution, we exercise our independent judgment. [Citation.]" (*People v. Simon*, *supra*, 1 Cal.5th at p. 120.)

The People argue that the exigency was "that there was a possible juvenile being trafficked in Wilkins's room . . . ." The magistrate agreed, ruling that the warrantless entry was reasonable because the police had reason to believe there was "[a] minor

41

engaging in prostitution" in the room.  The trial court similarly upheld the warrantless entry because the police believed human trafficking of a minor was "going on in the room."

The People do not argue that the police could make a warrantless entry to prevent an act of prostitution by two consenting adults.  The mere prevention of a crime does not constitute an exigency per se.  "'It is . . . a shocking proposition that private homes . . . may be indiscriminately invaded at the discretion of any suspicious police officer engaged in following up offenses that involve no violence or threats of it.'"  (*Welsh v. Wisconsin* (1984) 466 U.S. 740, 751.)  For example, the mere fact that a person inside a house is in possession of illegal drugs is not enough to authorize a warrantless entry.  (*People v. Torres* (2012) 205 Cal.App.4th 989, 995 [possession of less than 28.5 grams of marijuana].)  Rather, when the warrantless entry is to prevent a crime, the crime must threaten some kind of immediate harm to the victim.  In the shared view of the People, the magistrate, and the trial court, if the victim is a minor, then human trafficking and/or an imminent act of prostitution (and hence statutory rape, § 261.5) poses a threat of such harm.

We accept this proposition for the sake of argument.  Even if so, it would require an objectively reasonable basis for believing that the victim is a minor.  Here, the police had no such objectively reasonable basis as to Molly.

According to Jane, Molly said she was 20.  Jane did add that "she could have been younger because . . . sometimes people lie about their age."  However, this was

speculation on Jane's part. In fact, Jane's uncertainty showed that Molly was *not* obviously *not* 20. The fact that Jane herself was a minor established only that defendants did not carefully screen the ages of the prostitutes whom they pimped; it did not establish some kind of pattern or practice of pimping minors and minors only. Sergeant Oldendorf had seen Molly walking the street; nevertheless, there was no evidence that he told Detective Hernandez that she appeared to be a minor. Evidently he, at least, did not think there was any immediate need to detain her to prevent a minor from committing prostitution.[10]

Significantly, none of the officers involved actually claimed that they were trying to save Molly from either human trafficking or an act of prostitution. According to Deputy Deloria, they decided "to force entry to ensure that the possible . . . juvenile victim[] was okay and not being held hostage." However, there was no evidence that Molly was being held hostage, and there was no evidence that she was not okay (apart from engaging in prostitution). There was no reason why the police could not wait for a warrant. In the meantime, a reasonable police officer would stake out both rooms. That way, if Vaughn, Wilkins, or Molly went in or out, the police could contact them or even detain them.

We therefore called for further briefing on the question of whether the inevitable discovery exception to the exclusionary rule applies here.

---

[10]    Apparently Molly actually *was* 18 or older — or, at least, the People could not prove that she was not; as to her, defendants were convicted of simple pimping and pandering, not pimping of a minor or pandering of a minor.

"'Under the inevitable discovery doctrine, illegally seized evidence may be used where it would have been discovered by the police through lawful means. . . . The purpose of the inevitable discovery rule is to prevent the setting aside of convictions that would have been obtained without police misconduct.' [Citations.]" (*People v. Fayed* (2020) 9 Cal.5th 147, 183-184.) "The inevitable discovery exception requires the court "'to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred.'" [Citation.]" (*People v. Hughston* (2008) 168 Cal.App.4th 1062, 1072.)

"[T]he inevitable discovery doctrine [does not] appl[y] . . . simply because the police had sufficient probable cause to obtain a warrant to enter . . . and to seize the evidence legally. [Citation.]" (*People v. Superior Court* (*Walker*) (2006) 143 Cal.App.4th 1183, 1215.) "If warrantless searches could be upheld on an inevitable discovery theory on the basis that a warrant *would* have issued, no one would bother to secure one." (*People v. Acevedo* (1989) 216 Cal.App.3d 586, 593, revd. on other grounds *sub nom*. *California v. Acevedo* (1991) 500 U.S. 565.) "Instead, . . . respondent must demonstrate by a preponderance of the evidence that, due to a separate line of investigation, application of routine police procedures, or some other circumstance, the [evidence] would have been discovered by lawful means." (*People v. Hughston*, *supra*, 168 Cal.App.4th at p. 1072.)

"'The phrase "inevitable discovery" is somewhat of a misnomer' inasmuch as the 'doctrine does not require certainty. [Citation.] Rather, the People must show a

44

"reasonable probability that [the challenged evidence] would have been procured in any event by lawful means."' [Citation.]" (*People v. Cervantes* (2017) 11 Cal.App.5th 860, 872, fn. 11.) "'The showing must be based not on speculation but on "demonstrated historical facts capable of ready verification or impeachment."' [Citation.] However, in assessing whether evidence would inevitably have been discovered, 'this "court does not leave its common sense at the door."' [Citation.]" (*Id.* at p. 872, fn. omitted.)

The People may raise inevitable discovery for the first time on appeal, "if the factual basis for the theory is fully set forth in the record. [Citations.]" (*People v. Robles* (2000) 23 Cal.4th 789, 801, fn. 7.)

As already mentioned, if the unlawful entry had never occurred, the police would instead have staked out Room 112. Sergeant O'Brien, Detective Hernandez, Deputy Deloria, and a fourth officer on the scene were all members of a specialized human trafficking task force. If they had known that they could not enter Room 112, they would not have just walked away. Moreover, instead of knocking on the door of Room 109, they would have staked out that room, too. That way, Vaughn could not warn Wilkins that the police were there (nor vice versa).

At some point, Wilkins would have come out; then the police would have arrested him. A police officer can make a warrantless arrest when the officer has probable cause to believe the arrestee has committed a felony. (§ 836, subd. (a).) Here, the officers had ample probable cause to arrest Wilkins. Jane said Vaughn and her pimp — whom she identified as DeeTee —had brought her and Molly to San Bernardino. They had checked

45

into the Econo Lodge that day at about 3:00 p.m. Jane had a keycard to Room 112. The owner of the Econo Lodge said room 109 was registered to Vaughn, and room 112 was registered to Wilkins. They had arrived together and they had checked in around 3:00 p.m. Although Jane claimed her pimp was DeeTee, and she denied knowing Wilkins, Detective Hernandez did not believe her, because "prostitutes . . . attempt to protect their pimp." At that point, Detective Hernandez had probable cause to believe that the person in Room 112, who was Wilkins, had committed pimping, a felony. (§ 266h.)

It is reasonably certain that Wilkins would have had his cellphone on him. It was a vital tool of his trade. "[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." (*United States v. Robinson* (1973) 414 U.S. 218, 235.) Thus, the officers could and would have lawfully searched Wilkins's person and seized his cellphone. Once they had the cellphone, they could — as they in fact did — obtain a search warrant for its contents. (See generally *Riley v. California* (2014) 573 U.S. 373, 386.)

Wilkins argues that, before leaving Room 112, he would have deleted all of the information on his cellphone.[11] However, he would not have known any more than he

---

[11]    In so arguing, Wilkins cites evidence that was introduced at trial, not at the preliminary hearing — that Wilkins drove by twice while Jane was detained by Sergeant Oldendorf; that Wilkins, Vaughn, and Molly all tried to contact Jane after she was

*[footnote continued on next page]*

already knew when he was actually arrested — i.e., that Jane had been incommunicado for over four hours and was apparently in custody. Despite that knowledge, he had not yet deleted the information on his cellphone. And as more time went by, he would have come to believe that Jane had not snitched and he was safe.

In any event, the Cellebrite hardware/software system that the police used to extract the data from the cellphone could recover deleted data. Moreover, the extraction reports show that it did, in fact, recover deleted data from Wilkins's phone.

Last but not least, this argument proves too much. If Wilkins is *correct* — if what he knew at 10:15 p.m. *would* have led him to delete the data on his cellphone (or even to destroy the phone or its SD card) — then the exigent circumstances exception to the warrant requirement applies. It is well-established that the police may make a warrantless entry and search when there is probable cause to believe it is necessary to do so to prevent the imminent destruction of evidence. (*People v. Celis* (2004) 33 Cal.4th 667, 676.)

Having held that Wilkins's arrest and the seizure of his cellphone were inevitable, we turn to his statement to the police. After he was unlawfully arrested, he waived his

detained; and that Wilkins and Vaughn phoned and texted each other after Jane was detained.

We see no problem with this. As we are raising inevitable discovery for the first time on appeal and reviewing the issue de novo, it is appropriate for us to consider the entire record. In any event, we have the option of remanding to the trial court with directions to consider the issue of inevitable discovery. (*People v. Gesner* (1988) 202 Cal.App.3d 581, 592.) It would be wasteful to do so, if the evidence already introduced at trial either proves or disproves inevitable discovery.

*Miranda* rights and gave a statement. We see no reason to suppose that, if he had been lawfully arrested, he would not have done the same thing. However, we need not decide this point, because his statement was never introduced at trial.

Wilkins also claims that the following were inadmissible as fruits of the poisonous tree: (1) the officers' testimony that he had barricaded the motel door, (2) his statements while inside the motel room, apologizing for barricading the door and admitting that he knew the police were outside, (3) the condoms and women's clothing found inside Room 112, and (4) the women's clothing found in the consent search of his SUV.

Assuming, without deciding, that Wilkins is correct, the admission of this evidence was harmless beyond a reasonable doubt. Jane's testimony, once combined with the evidence found on his cellphone, made this an open and shut case. His barricading the door, the women's clothing, and the condoms were even less than icing on the cake — sprinkles on the icing, at best.[12]

In sum, then, the officers' entry into Room 112, their arrest of Wilkins, and their searches of him, his room and arguably his SUV were unconstitutional. The police, however, would inevitably have arrested Wilkins lawfully and seized his cellphone lawfully; the other evidence obtained unconstitutionally was harmless.

---

[12] One might also include the $900 in cash found on Wilkins when he was booked. Like the cellphone, it seems reasonably probable that he would have had this on his person during all waking hours so that it, too, was subject to inevitable discovery. Even if not, however, the admission of this evidence, too, was harmless.

## VI

## COMMENTS BY A PROSPECTIVE JUROR

Defendants contend that the trial court erred by denying their motion for a mistrial after one prospective juror said, during voir dire, that someone found guilty of the charged crimes should be publicly executed.

A.    *Additional Factual and Procedural Background*.

During voir dire, when Juror No. 64 was asked if he knew anyone in the legal community, he said he was related to aa judge, whom he named.  When asked whether anyone he knew had been a victim of a crime, he said:

"PROSPECTIVE JUROR:  . . . Recently my neighbor across the street's daughter who ended up missing, ended up in the sex trade.  And if it weren't for some dedicated retired Navy Seals and law enforcement officers, she's still be out on the street or dead.  So I have some very strong opinions about that.

"THE COURT:  Do you think those opinions would be such you probably shouldn't be a juror on this case?

"PROSPECTIVE JUROR:  All I know is if somebody is found guilty of something like that, I think they ought to bring back public execution as far as I'm concerned."

He also said that one of the attorneys present "was opposing counsel in my divorce a few years back," and added, "I don't have a whole lot of respect for him."

After other prospective jurors were questioned, there was a discussion outside the presence of the jury. Counsel for Wilkins said he had practiced family law, so "I think that the comment was and the glare was directed at me." By stipulation, the trial court excused Juror No. 64 for cause.

The next morning, while voir dire was still ongoing, both defendants moved for a mistrial or, in the alternative, a new jury panel. They argued that the remarks by Juror No. 64 had "poisoned the whole panel." Counsel for Vaughn said that when the juror referred to execution, "it seems to me that he made a gesture. I'm not going to stand on that, but my impression is he made a gesture . . . it was like he was impaling me with a fence post . . . ."

The trial court denied a mistrial. It explained, "[T]hat juror is no longer here. [¶] So, then the issue really becomes were his comments so egregious so as to poison whatever juror ultimately remains on this case? I don't think that's the case. His comments were outlandish. His body language and his tone of voice was rather bizarre. The fact that he was name dropping one minute, making rather far-out political statements the next minute, glaring at someone over a bad divorce the next minute, really led me to believe he appeared to be a rather unbalanced person.

"That is not the type of person who will lead a jury. . . . [H]is comments, I think, were seen as so outlandish by the rest of the panel that . . . it actually benefits defendants . . . ."

"We ask people to be honest.  Once we find out about those views, we either excuse them for cause or counsel will exercise peremptory challenges."

The next morning, Vaughn's counsel reminded the other prospective jurors of Juror No. 64's remarks and asked, "[B]y a show of hands, are there any of you who feel that way?  [¶]  I'm seeing quite a few head shakes . . . I'm not seeing any hands that are raised."  He asked the juror who had been sitting next to Juror No. 64, "How did you feel when you heard those statements made?"; she  said, "Kind of harsh, unexpected."

B.     *Discussion*.

"""A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.  [Citation.]  Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.  [Citation.]"  [Citation.]  A motion for a mistrial should be granted when """a [defendant's] chances of receiving a fair trial have been irreparably damaged.""""  [Citation.]"  (*People v. Silveria and Travis*, *supra*, 10 Cal.5th at p. 298.)

"[T]he trial court possesses broad discretion to determine whether or not possible bias or prejudice against the defendant has contaminated the entire venire to such an extreme that its discharge is required."  (*People v. Medina* (1990) 51 Cal.3d 870, 889.)  "[S]uch a drastic remedy is [not] appropriate as a matter of course merely because a few prospective jurors have made inflammatory remarks."  (*Ibid*.)  "[D]ischarging the entire venire is a remedy that should be reserved for the most serious occasions of demonstrated

51

bias or prejudice, where interrogation and removal of the offending venirepersons would be insufficient protection for the defendant." (*Ibid*.) We see no way to distinguish a motion to discharge the venire from a motion for a mistrial, when made on the same grounds.

"We review the denial of a mistrial motion for abuse of discretion. [Citation.]" (*People v. Sanchez* (2019) 7 Cal.5th 14, 64.) "'"[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it."'" [Citation.]" (*People v. Charles* (2015) 61 Cal.4th 308, 333.)

"'[T]he trial judge is in a better position to gauge the level of bias and prejudice created by juror comments [during voir dire].'" (*People v. Nguyen* (1994) 23 Cal.App.4th 32, 41, second set of brackets in original.) Here, the trial court — which had the advantage of being able to observe Juror No. 64, as well as the other prospective jurors' reactions — found that the remarks did not "poison" the jury panel. As it noted, his remarks seemed just as likely to have the opposite effect. He appeared to the court to be "bizarre" and "unbalanced"; his remarks were extreme and "outlandish." One prospective juror found them "harsh" and "unexpected." Thus, the other jurors would most likely conclude that Juror No. 64 was out of line and had improperly prejudged defendants.

Defendants rely on *Mach v. Stewart* (9th Cir. 1997) 137 F.3d 630. That was a prosecution for sexual conduct with a minor under 14 (*id*. at p. 631), based largely on the victim's testimony. (*Id*. at p. 634.) One prospective juror was a social worker; she said

52

she had training and experience in psychology, including child psychology. (*Ibid*.) She also said (four times) that, in her experience, "she had never . . . become aware of a case in which a child had lied about being sexually assaulted." (*Id*. at p. 632.) The trial court excused her for cause, but it denied the defendant's motion for a mistrial. (*Ibid*.)

The appellate court held that this was error. (*Mach v. Stewart*, *supra*, 137 F.3d at pp. 632-634.) It said: "Highly significant is the nature of the information and its connection to the case. [Citations.] The result of the trial in this case was principally depend[e]nt on whether the jury chose to believe the child or the defendant. There can be no doubt that [the juror]'s statements had to have a tremendous impact on the jury's verdict. The extrinsic evidence was highly inflammatory and directly connected to Mach's guilt." (*Id*. at p. 634.)

The vice of the juror's statements in *Mach* was that the jurors were likely to view them (in the *Mach* court's words) as "extrinsic evidence." The error, then, was akin to a prosecutor stating facts in closing argument that have not been proved at trial, or a juror conducting an independent investigation. Here, by contrast, to the extent that Juror No. 64 stated facts at all, they were about a neighbor's daughter; no juror could have mistaken them for evidence in this case. Otherwise, his statements were opinions, not facts.

Defendants cite the following statements that other jurors made later during voir dire; they claim these showed that they had been affected by Juror No. 64's remarks. We disagree.

53

(1)  Counsel for Wilkins asked Juror No. 22, "Tell me something negative from the experience [of being a juror]."  The juror replied, "Other than the juror you interviewed, . . . what did he say, ou[gh]t to be hanged?"

(2)  Juror No. 144  said:  "I'm just going to be honest.  It is a deplorable crime . . . ."  "[I]t's been mentioned a minor is involved.  I am of the belief they are guilty until proven innocent because children are children.  And I'd rather make sure somebody isn't out there to re-offend or reintroduce them to that type of life than to risk their being out and having that person in the community to continue [to] do that type of stuff."  "Normally when a minor is not involved I could . . . presume them to be innocent until they are . . . proven guilty.  In this particular situation, I would be presuming them guilty until I had evidence that would give me . . . some definite that they were innocent [*sic*].  Otherwise, if there's doubt, I am going to presume they are guilty."  The trial court excused her for cause.

(3)  Juror No. 166  said:  "I'm going to speak similarly to [Juror No. 144] . . . ."  "If you are here there is a reason you are here and this type of crime does kind of bother me a little bit, to be honest."  "And I've heard you saying try and can you . . . be . . . impartial, innocent until proven guilty.  I have to be honest with you, I am not sure on anything like this."  She  agreed that "if someone is charged with a crime that involves something like that, they should just not even get a trial[.]"  Due to "the topic," "[t]his [jury] is probably not the right one for me."  The trial court excused her for cause.

(4)  Juror No. 128  said:  "I feel they are guilty."  "I feel like if . . . they took you in and [you are] going to trial, then I feel that you did something wrong."  "[T]hat belief is pretty strong[.]"  He did not feel he could "look at them and presume them innocent . . . [.]"  Even if the prosecution "didn't show any evidence," he would still "feel they are guilty."  Nothing would change his mind.  The trial court excused him for cause.

Regarding Juror No. 22, it is not surprising that she remembered Juror No. 64's remarks.  They had been made just one day earlier, and counsel for Vaughn had reminded the panel of them at the beginning of the day.  This does not mean that she was prejudiced by them.  Indeed, she characterized them as a negative experience.  She assured counsel that she was willing to listen to all the evidence and to make a decision based on the trial court's instructions.

Regarding Jurors No. 128, 144, and 166, the record does not show any causal link between Juror No. 64's remarks and their own self-confessed biases.  In a trial for human trafficking, pimping, and pandering, in which at least one victim is a child, it is not surprising that some prospective jurors would be disgusted and thus would have difficulty applying the presumption of innocence.  As far as it the record shows, however, this difficulty arose from their own preexisting sentiments and life experiences, not from anything Juror No. 64 said.  For example, Juror No. 128 worked as a correctional officer.  He felt it would be hard for him to be fair in this case "due to [his] job," and because he had a 14-year-old child.  He did not mention Juror No. 64.  Neither did Jurors No. 144 and 166.

55

Under defendants' analysis, as soon as one juror admits a bias against persons charged with pimping a minor, the entire panel must be excused and a new jury empaneled. This would be unnecessary as well as impractical. As the trial court correctly observed, the process of jury selection demands that prospective jurors can safely be honest and fess up to their biases. If an expression of bias like that by Juror No. 64 were enough to taint an entire jury panel, jury trials would become impossible. The ordinary remedy for such an expression of bias is a challenge for cause and, if that fails, a peremptory challenge. We see no reason why that was not adequate here.

Finally, even assuming that Juror No. 64's remarks did "poison" Prospective Jurors No. 128, 144, and 166, the trial court excused all four of them for cause. There would be no reason to suppose that any of the other jurors were affected.

Defendants complain that "the court never queried the venire panel to determine whether any prospective juror was affected . . . ." They forfeited any claim that this was error by not asking the trial court to do so. (*People v. Ramos* (2004) 34 Cal.4th 494, 516.) Moreover, it seems unnecessary, as they were free to query the panel themselves. Counsel for Vaughn did specifically ask if any of the panel members agreed with the remarks; no one said they did. The trial court continued to ask prospective jurors if they felt they could be fair. This proved sufficient to bring out the biases of Prospective Jurors No. 128, 144, and 166. "To be an abuse of discretion, the trial court's failure to ask questions 'must render the defendant's trial fundamentally unfair.' [Citation.]" (*People v. Cleveland* (2004) 32 Cal.4th 704, 737.) There is no indication that that happened here.

56

Defendants also complain that the trial court "did not admonish or instruct the jury." Again, they forfeited any claim that this was error by not requesting any admonition or instruction. (*People v. Ramos*, *supra*, 34 Cal.4th at p. 515.) They may well have wanted to avoid further emphasizing Juror No. 64's remarks. (See *ibid*.) They cannot have it both ways by claiming later that this was error.

We therefore conclude that it was not an abuse of discretion to deny the motion for mistrial.

VII

THE SUFFICIENCY OF THE EVIDENCE

THAT VAUGHN KNEW JANE WAS A MINOR

Vaughn contends that there was insufficient evidence that he knew Jane was underage to support his convictions for human trafficking of a minor and pimping a minor.

"Mistake of fact as to the age of a victim . . . who is a minor at the time of the commission of the offense is not a defense" to human trafficking of a minor. (§ 236.1, subd. (f).) Likewise, "a good faith belief the minor is 18 [or over] is not a defense to pimping . . . a minor." (*People v. Branch* (2010) 184 Cal.App.4th 516, 520-522, capitalization altered.)

Vaughn argues, however, that he was guilty of crimes against Jane, if at all, only as aider and abettor. "Aiding and abetting liability requires 'the intent or purpose of committing, encouraging, or facilitating the commission of *the offense*.' [Citation.]"

57

(*People v. Hardy* (2018) 5 Cal.5th 56, 96, italics added.)  Vaughn therefore argues that, while Wilkins, as the direct perpetrator, could be guilty even if he did not know that Jane was underage, he, Vaughn, as the aider and abettor, *did* have to know that Jane was underage.

The People did not initially dispute the legal validity of this argument.  Instead, they argued that there was substantial evidence that Vaughn knew that Jane was a minor, because he had previously been convicted of sex trafficking of minors, and because he spent a significant amount of time in the car with her.  Vaughn's past experience, however, was with 14, 15, and 16-year-olds.  Jane was 17 years 3 months old.  There are a number of photos of her in the record.  She was neither petite nor undeveloped; she appeared to be full-grown.  And the People point to nothing about Jane's behavior or her interactions with defendants that would have screamed "minor."  Thus, we agree with Vaughn that there was no substantial evidence that he knew Jane was a minor.

The People also argued that Vaughn was a perpetrator of both offenses, because he tried to persuade Jane to continue to work as a prostitute for Wilkins.  In Los Angeles, when Jane wanted to leave Wilkins, both Wilkins and Vaughn confronted her; Vaughn said that Wilkins "was a good person" who "was there for [her] best interest."  Arguably, this was sufficient evidence of an attempt to persuade Jane "to engage in a commercial sex act," and thus of the crime of human trafficking.  (§ 236.1, subd. (c).)[13]

---

[13]    It did not show that Vaughn committed pimping, as a perpetrator, because there was no evidence that he "derive[d] support or maintenance . . . from the earnings or proceeds of [Jane]'s prostitution . . . ."  (§ 266h.)  Admittedly, there was evidence that

*[footnote continued on next page]*

As Vaughn notes, however, the prosecutor made an election to rely solely on an aiding and abetting theory. In closing argument, she said that, in the counts involving Molly, Vaughn was a "direct perpetrator"; however, the counts involving Jane were "based upon the aiding and abetting theory." As to count 4 (human trafficking), she said, "the question . . . is did Vaughn do anything in his words or conduct in which he aided and abetted Wilkins commission of causing Jane Doe to engage in a commercial sex act?" "Then going to count 5 is the other count Vaughn is charged as aider and abettor for the pimping of a minor age 16 or older."

"[W]hen the prosecution has made an election, under circumstances where a unanimity instruction would otherwise have been required, then we, too, are bound by that election. Thus, if the defendant raises a substantial evidence challenge, our review is limited to whether there is sufficient evidence to support a conviction based exclusively on the act elected by the prosecution. [Citation.]" (*People v. Brown* (2017) 11 Cal.App.5th 332, 341-342.) Therefore, we consider only evidence of Vaughn's guilt as an aider and abettor.

However, we reject the legal premise of Vaughn's argument — that because he was charged as an aider and abettor, there had to be evidence that he knew Jane was a minor.[14]

Wilkins and Vaughn were "pimp partners." However, there was no evidence that they split their revenue. An expert testified that pimp partners may or may not do so.

[14] Because the People had not initially questioned Vaughn's legal premise, we allowed both sides to submit supplemental briefing on its validity.

We have found almost no California case law on whether an aider and abettor must have knowledge of an element of a crime when the perpetrator need not. This issue could arise in any number of situations. For example, possession of a machine gun does not require knowledge of the nature of the weapon (*People v. May* (2020) 47 Cal.App.5th 1001, 1006-1009); what about aiding and abetting the possession of a machine gun? Robbery does not require the intent to use force or fear; it can be committed by accidentally striking the victim during the taking. (*People v. Anderson* (2011) 51 Cal.4th 989, 994-996.) Can one aid and abet such a robbery? And other offenses, like those here, require that the victim be a minor but do not require knowledge that the victim is a minor. (E.g., § 288 [lewd and lascivious act on a child under 14]; see *People v. Olsen* (1984) 36 Cal.3d 638, 647 ["a reasonable mistake as to the victim's age is not a defense to a section 288 charge."].)

Rather than seek a broad principle applicable to all such cases, we decide this case on narrower grounds. We look to the statutes defining the crimes charged in this case.

As already mentioned, the statute defining human trafficking of a minor declares: "Mistake of fact as to the age of a victim of human trafficking who is a minor at the time of the commission of the offense is not a defense to a criminal prosecution under this section." (§ 236.1, subd. (f).) A perpetrator and an aider and abettor are both principals in the same crime. (§ 31.) A person charged with human trafficking of a minor, as an aider and abettor, is subject to "a criminal prosecution under" section 236.1. Thus, the

60

plain language of the statute eliminates a mistake as to the victim's age as a defense for both a perpetrator and an aider and abettor.

While the statute is unambiguous on this point, its legislative history confirms our reading of it. In 2012, Proposition 35 substantially revised section 236.1. Among other things, it created the new crime of human trafficking of a minor (§ 236.1, subd. (c))[15] and enacted the provision that a mistake of fact as to age is not a defense. The ballot argument in favor of the measure stressed the protection of children. It said, "Many sex trafficking victims are vulnerable children." (Voter Information Guide, Gen. Elec. (Nov. 6, 2012) argument in favor of Prop. 35, p. 46.) "Many victims are girls as young as 12." (*Ibid.*) "[W]e need Prop. 35 to protect children from exploitation. (*Ibid.*) "Prop. 35 holds human traffickers accountable for their horrendous crimes." (*Ibid.*, italics omitted.) This emphasis on making human traffickers accountable for sexual exploitation of children suggests that the electorate did not intend to give aiders and abettors a defense that it denied to perpetrators.

Vaughn argues that "abet," as used in section 31, requires scienter as to each element of the charged offense. "Aiding and abetting liability requires 'the intent or purpose of committing, encouraging, or facilitating the commission of the offense.' [Citations.]" (*People v. Hardy*, *supra*, 5 Cal.5th at p. 96.) However, the bare wording of

---

**15** Previously, all human trafficking, whether of a minor or an adult, had required that the defendant "deprive[] or violate[] the personal liberty" of the victim, although the penalty was greater when the victim was a minor. (Former § 236.1, subds. (a)-(c), Stats. 2005, ch. 240, § 7, p. 2507.) Proposition 35 removed this requirement when the victim is a minor.

section 31 does not always require the specific intent to commit the exact offense that the perpetrator actually commits, as shown by the natural and probable consequences doctrine. (See generally *People v. Prettyman* (1996) 14 Cal.4th 248, 260-263.)

We recognize that, "outside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) "[T]he aider/abettor's guilt is based on the combined acts of all the principals and on the aider/abettor's own knowledge and intent." (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 917.) We are not violating this principle; under section 236.1, the direct perpetrator does not have to know the victim's age, and neither does the aider and abettor. But even assuming section 236.1 is inconsistent with section 31, then, to that extent, section 236.1 is the more recent statute and must take precedence. (See *People v. Bustamante* (1997) 57 Cal.App.4th 693, 699.) Section 236.1, in combination with section 31, does at least require the aider and abettor to intend to aid the commission of pimping, pandering, or another enumerated offense. Thus, it does not impose criminal liability on an aider and abettor without any mens rea at all. (See *State v. Bowman* (N.C. Ct. App. 2008) 188 N.C.App. 635, 650 ["Although statutory rape is a strict liability crime, aiding and abetting statutory rape is not."]; 2 LaFave, Substantive Criminal Law (3d ed. 2020) General Principles, § 13.2(f) [subject to statutory exceptions, aider and abettor is not guilty of a strict liability offense if he or she acts without knowledge of the facts making the principal's conduct a crime].)

With respect to pimping, the analysis is a little different, although it leads to the same conclusion.

Section 266h, subdivision (a) provides that "any person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution, or from money loaned or advanced to or charged against that person by any keeper or manager or inmate of a house or other place where prostitution is practiced or allowed, or who solicits or receives compensation for soliciting for the person is guilty of pimping . . . and shall be punishable by imprisonment in the state prison for three, four, or six years." (§ 266h, subd. (a).)

Section 266h, subdivision (b) then provides that a person who does exactly the same thing, when the prostitute is a minor, is guilty of pimping a minor, a felony, and shall be punishable as follows:

"(1) If the person engaged in prostitution is a minor 16 years of age or older, the offense is punishable by imprisonment in the state prison for three, four, or six years.

"(2) If the person engaged in prostitution is under 16 years of age, the offense is punishable by imprisonment in the state prison for three, six, or eight years." (§ 266h, subd. (b).)

*People v. Branch*, *supra*, 184 Cal.App.4th 516 held that a good faith belief that the victim is 18 or older is not a defense to either pimping or attempted pimping of a minor. (*Id*. at pp. 520-523.) It reasoned that the "defendant's conduct would be criminal regardless of [the victim]'s age." (*Id*. at p. 522.) "[T]he criminal intent for the crimes of

63

attempted pimping . . . of a minor is the attempt to pimp . . . ; the age of the victim only affects the severity of the sentence, not the criminality of the conduct." (*Ibid*.)

The same reasoning applies to aiding and abetting. Pimping is a general intent crime. (*People v. McNulty* (1988) 202 Cal.App.3d 624, 631.) Aiding and abetting, however, requires specific intent. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1131.) "To be culpable, an aider and abettor must intend not only the act of encouraging and facilitating but also the *additional* criminal act the perpetrator commits." (*Id*. at p. 1129.)

Pursuant to *Branch*, the only criminal intent necessary to aid and abet pimping of a minor is the intent that the perpetrator commit pimping. The aider and abettor need not intend that the perpetrator commit pimping specifically of a minor. "[T]he age of the victim only affects the severity of the sentence, not the criminality of the conduct." (*People v. Branch*, *supra*, 184 Cal.App.4th at p. 522.)

As the People aptly note, "in some circumstances, severely enhanced penalties may be imposed absent the accused's knowledge of all the facts bringing his conduct within the prohibition of the statute." (*People v. Coria* (1999) 21 Cal.4th 868, 879; e.g., *People v. Ervin* (1997) 53 Cal.App.4th 1323, 1330-1331 [first degree robbery, based on victim's use of ATM, does not require knowledge that victim used ATM]; *People v. Magpuso* (1994) 23 Cal.App.4th 112, 115 [aggravated punishment for kidnapping child under 14 does not require knowledge of child's age]; *People v. Deleon* (1982) 138 Cal.App.3d 602, 606-607 [great taking enhancement does not require knowledge of value of loot].) *People v. Price* (1989) 210 Cal.App.3d 1183, overruled on other grounds by

*People v. Meza* (1995) 38 Cal.App.4th 1741, 1748-1749, specifically held that a weight enhancement does not require knowledge of weight of drugs, regardless of whether the defendant is a perpetrator or aider and abettor of the underlying crime. (*Price*, *supra*, at pp. 1193-1194.)

Vaughn argues that, if he can be guilty of aiding and abetting without any knowledge of the victim's age, then the relevant statutes are unconstitutionally vague. He is confusing vagueness with strict liability as to a single element. "'[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. [Citations.]' [Citation.]" (*People v. Redd* (2010) 48 Cal.4th 691, 717, italics omitted.) As to a perpetrator, the pimping and pandering statutes are not vague. (*People v. Campbell* (2020) 51 Cal.App.5th 463, 491-493 [pandering]; *People v. Grant* (2011) 195 Cal.App.4th 107, 115 [pimping].) However, the perpetrator must shoulder the risk that the prostitute is underage. The same is true of an aider and abettor: The aider and abettor must intend that the perpetrator commit pimping or pandering but must shoulder the same risk. We repeat, the aider and abettor cannot be convicted without any criminal intent at all.

We therefore conclude that Vaughn could be guilty of both human trafficking of a minor and pimping a minor, as an aider and abettor, even if he did not know that Jane was a minor.

VIII

SENTENCING OF WILKINS

Wilkins contends that the trial court abused its discretion by denying him probation and by sentencing him to the upper term on count 1 (human trafficking of Jane).

A.    *Additional Factual and Procedural Background*.

1.    *The probation report*.

The probation officer reported that Wilkins was eligible for probation.

With respect to probation, she  found four aggravating factors:  (1) he inflicted physical or emotional injury; (2) the manner in which the crime was carried out demonstrated criminal sophistication or professionalism; (3) he had a prior record of criminal conduct; and (4) he had not shown remorse.  (See Cal. Rules of Court, rule 4.414(a)(4), (a)(8), (b)(1), (b)(7).)

She listed four mitigating factors:  (1) he had no pattern of regular or increasingly serious criminal conduct; (2) his prior performance on probation was satisfactory; (3) imprisonment would seriously affect him and his dependents; (4) a felony conviction would adversely affect his life.  (See Cal. Rules of Court, rule 4.414(b)(1), (b)(2), (b)(5), (b)(6).)

The probation officer recommended that probation be denied.

With respect to the sentence to be imposed, she reported that there were no aggravating factors.[16] (See Cal. Rules of Court, rule 4.421.) She found two mitigating factors: (1) he had an insignificant record of criminal conduct; and (2) his prior performance on probation was satisfactory. (Cal. Rules of Court, rule 4.423(b)(1), (b)(6).) She recommended a sentence on count 1 of eight years (the midterm). (§ 236.1, subd. (c)(1).)

### 2. *The sentencing hearing.*

At sentencing, Wilkins's counsel did not request probation. He asked the trial court to impose either the low term or the midterm on count 1, and either to run all other counts concurrently or to stay them.

The trial court observed that it had discretion to grant probation. However, it declined to do so. It explained: "Mr. Wilkins has made it abundantly clear that he has no respect for the [c]ourt. He has no inten[tion] of abiding by lawful court orders. [¶] [T]he defendant made a mockery of this court, the judicial process, and the jury, both during his testimony but also while he laughed and scoffed at Jane Doe during her testimony, during his almost constant and incessant interruptions during the trial. [¶] As such, I'll find he is not a good candidate for probation inasmuch as I have no reason to believe he would ever obey a lawful order of this [c]ourt."

---

**16** The probation officer, however, had just found, for purposes of probation, that the crime showed sophistication or professionalism; this is also an aggravating factor for purposes of the sentence to be imposed. (*Id*., rule 4.421(a)(8).) There is no bar to the dual use of a fact for both purposes. (*People v. Hunt* (1982) 133 Cal.App.3d 543, 563.)

With respect to aggravating and mitigating factors regarding the sentence, it disagreed with the probation officer. It found two aggravating factors: (1) the manner in which the crime was carried out indicated sophistication; and (2) Wilkins had a prior conviction for a prostitution-related offense. It also found no mitigating factors. It observed that "[t]he hundreds, if not thousands, of texts and photographs attributed to Mr. Wilkins . . . justify the aggravated sentence in this case."

It therefore sentenced Wilkins to 12 years (the upper term) on count 1. All other terms were either one-third the midterm, to be served consecutively, or stayed.

B.    *Discussion*.

1.    *The denial of probation*.

Wilkins contends that the trial court erred by denying him probation, because it did so to punish him for his disrespect during trial.

Wilkins's defense counsel forfeited this contention by failing to raise it below. He did not request probation; when the trial court denied probation, he did not object, nor did he object to its stated reasons. "[C]laims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" are forfeited if not raised in the trial court. (*People v. Scott* (1994) 9 Cal.4th 331, 353.)

The contention lacks merit in any event. In this respect (and others, as will be seen), the probation report was wrong. A person convicted of either pimping (§ 266h) or pandering (§ 266i) is categorically ineligible for probation. (§ 1203.065, subd. (a).)

68

In fairness to the trial court, we note that, even if Wilkins were eligible, it properly denied probation. "The grant or denial of probation is within the trial court's discretion and the defendant bears a heavy burden when attempting to show an abuse of that discretion. [Citation.]" (*People v. Aubrey* (1998) 65 Cal.App.4th 279, 282.) "A court abuses its discretion 'whenever the court exceeds the bounds of reason, all of the circumstances being considered.' [Citation.]" (*People v. Downey* (2000) 82 Cal.App.4th 899, 909-910.)

Here, Wilkins's conduct at trial was relevant.[17] "In deciding whether to grant or deny probation, a trial court may also consider additional criteria not listed in the rules provided those criteria are reasonably related to that decision. [Citation.]" (*People v. Weaver* (2007) 149 Cal.App.4th 1301, 1313, disapproved on other grounds in *People v. Cook* (2015) 60 Cal.4th 922, 939.) Wilkins concedes that the trial court repeatedly admonished him "for laughing, talking, hissing or commenting during the prosecutor's questioning and certain witnesses' testimony, for making his own objections without waiting for defense counsel and for otherwise interrupting the proceedings." He claims the trial court was improperly trying to "punish" him for his disrespect. However, as the trial court expressly found, Wilkins's conduct indicated that he would not comply with the conditions of probation. This was a perfectly reasonable consideration.

---

[17] Wilkins does not argue that the trial court could not consider his conduct at trial under *any* circumstances — even if it was relevant for reasons other than retaliation or vindictiveness — and has forfeited any such contention.

69

Wilkins argues that, in fact, he could comply with conditions of probation, citing the probation officer's finding that he had previously completed probation successfully. That finding, however, was also wrong. In March 2013, Wilkins had been placed on probation for three years. Nevertheless, in August 2014, he committed a new offense. In May 2015, he was placed on probation for that offense for another three years. The evidence at trial, however, showed that he was already engaged in pimping not later than March 2018.

If only out of an excess of caution, we also note that Wilkins has not shown prejudice. There were just as many aggravating factors as mitigating factors. The probation officer recommended denying probation. Wilkins's own counsel did not dispute that recommendation and did not request probation. Thus, it is not reasonably probable that, if the trial court had disregarded Wilkins's behavior during trial, it would have granted him probation. (See *People v. Weaver*, *supra*, 149 Cal.App.4th at p. 1318.)

2. *The selection of the upper term*.

Wilkins contends that the trial court erred by imposing the upper term, because it incorrectly found that there were no mitigating factors.

The probation officer had found two mitigating factors: (1) an "insignificant" record of criminal conduct, and (2) satisfactory prior performance on probation. (Cal. Rules of Court, rule 4.423(b)(1), (b)(6).) As just discussed, however, the trial court properly found that Wilkins's prior performance on parole was *not* satisfactory. Equally, it could and did find that his criminal record was *not* insignificant. As it noted, one of his

70

prior convictions was related to prostitution; "in other words," as it said, "the conduct in this case has been a long-term antisocial type of conduct."

IX

SECTION 654

Defendants contend that the trial court violated section 654 by imposing a separate and unstayed sentences for both pimping of Molly and pandering of Molly.

Section 654, section (a), as relevant here, provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

"[T]he statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective. [Citations.]" (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) "'"" . . . If all of the offenses were incident to one objective, the defendant may [not] be punished . . . for more than one.'"" [Citation.]" (*People v. Jackson* (2016) 1 Cal.5th 269, 354.) "If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

"'Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence.' [Citation.]" (*People v. Latten* (2021) 63 Cal.App.5th 574, 577.)

Pandering consists of "'assisting, inducing, persuading or encouraging' a person to engage in prostitution. [Citations.]" (*People v. Campbell*, *supra*, 51 Cal.App.5th at pp. 485-486, fn. omitted; see § 266i, subd. (a)(1).) Pimping, as relevant here, consists of either (1) knowingly "liv[ing] or deriv[ing] support or maintenance . . . from the earnings or proceeds of [another] person's prostitution" or (2) "solicit[ing]" for a prostitute. (§ 266h, subds. (a), (b).)

Defendants argue that that they pandered Molly — i.e. they induced her to act as a prostitute — with the intent of receiving her earnings, and hence with the same intent with which they pimped her.

Defendants aptly cite *People v. DeLoach* (1989) 207 Cal.App.3d 323. There, the defendant coerced her daughter, on two separate occasions, to commit acts of prostitution. (*Id*. at pp. 328-330.) As a result, the defendant was convicted of pandering; of two forcible sex acts, which occurred on the first occasion; and of two nonforcible sex acts, which occurred on the second occasion. (*Id*. at pp. 331, 335.)

72

The appellate court held that section 654 applied to pandering and the nonforcible sex acts:  "It is necessarily part of the aim, objective and intent of a panderer that the person who is the object of the pandering become a prostitute.  Whether or not the latter actually goes on to become a prostitute or to perform acts of prostitution, it is indisputable that the panderer specifically intends and hopes that the person will do so.  Thus, as a general rule, any acts of prostitution that follow directly or proximately from the pandering are incident to a single objective and therefore constitute an indivisible transaction with it; that is, the subsequent sex offenses are incidental to the commission of the pandering, and are facilitated by it."  (*Id*. at p. 337.)

*DeLoach* also held, however, that section 654 did not apply to pandering and the forcible sex acts:  "While a panderer's specific intent may be to cause another to become a prostitute, the aim of forcing someone to submit to sex acts against their will is not an element of pandering and is not necessarily or generally intended by the panderer.  Although acts of prostitution . . . may be incidental to and indivisible with the specific objective of pandering, *forcible* sex acts are not."  (*People v. DeLoach*, *supra*, 207 Cal.App.3d at p. 338.)

Here, there was no evidence that either of the defendants (or any customer) used force or fear to compel Molly to engage in any sex act.  Thus, the "general rule" stated in *DeLoach* applies:  Defendants' receipt of the wages of Molly's prostitution resulted directly or proximately from their pandering of Molly; that is, their subsequent receipt of her wages was incidental to the pandering and facilitated by it.

73

The People also argue that the pandering and the pimping were "divisible in time." They cite *People v. Perez* (1979) 23 Cal.3d 545, which held that each sex crime committed during a single attack could be separately punished: "Defendant asserts that the trial court properly found that his sole intent and objective was to obtain sexual gratification . . . . We disagree. Such an intent and objective is much too broad and amorphous to determine the applicability of section 654. Assertion of a sole intent and objective to achieve sexual gratification is akin to an assertion of a desire for wealth as the sole intent and objective in committing a series of separate thefts. To accept such a broad, overriding intent and objective to preclude punishment for otherwise clearly separate offenses would violate the statute's purpose to insure that a defendant's punishment will be commensurate with his culpability. [Citation.]" (*Id*. at p. 552, fn. omitted.)

*Perez* is not relevant here. Pandering "is a one-act offense, . . . completed by a defendant's *act of procuring* . . . ." (*People v. White* (1979) 89 Cal.App.3d 143, 151.) Pimping, however, "is an ongoing continuing offense that occurs over a period of time." (*People v. Lewis* (1978) 77 Cal.App.3d 455, 462; accord, *People v. Dell* (1991) 232 Cal.App.3d 248, 265-266.) A single act of pimping goes on as long as the pimp and the prostitute are in an uninterrupted financial relationship. (*People v. Lewis*, *supra*, at p. 462.) Throughout that time, the panderer/pimp has a single intent and objective — money.

We therefore conclude that the trial court should have stayed the sentence on one of the two offenses. Ordinarily, it should stay the sentence on the lesser offense. (§ 654, subd. (a).) However, the sentencing range for pimping, for pandering, for pimping of a minor 16 or older, and for pandering of a minor 16 or older are all the same (§§ 266h, subds. (a), (b)(1), 266i, subds. (a), (b)(1));[18] moreover, the trial court imposed the same sentence for each of these crimes. As we must pick one, we will modify the judgment by staying the sentence for pandering.

X

AMENDMENTS TO SECTION 1170

Defendants contend that they are entitled to be resentenced under amendments to section 1170 that went into effect while this appeal was pending.

A. *Legal Background.*

Section 1170 was amended, effective January 1, 2022 in two respects that defendants contend are relevant here.

First, the amendments provide that a trial court can impose the upper term only when "the facts underlying th[e aggravating] circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) It carves out one exception: "[T]he

---

[18] In other words, the penalty for pimping or pandering a minor aged 16 or 17 (§§ 266h, subd. (b)(1), 266i, subd. (b)(1)) is the same as for pimping or pandering anyone (§ 266h, subd. (a), 266i, subd. (a)). We cannot help wondering why the Legislature singled out pimping or pandering of a minor aged 16 or 17 and thus required proof of an additional element.

75

court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).)

Second, the amendments also require the trial court to impose the lower term "if any of the following was a contributing factor in the commission of the offense:

"(A)  The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence.

"(B)  The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense.

"(C)  Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking."  (§ 1170, subd. (b)(6).)

Once again, it carves out an exception, which applies when "the court finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice . . . ."  (§ 1170, subd. (b)(6).)

The amendments apply to any defendant whose conviction was not yet final when they took effect.  (*People v. Flores* (2022) 75 Cal.App.5th 495, 500.)

B.      *Additional Factual and Procedural Background.*

The trial court sentenced both Wilkins and Vaughn to the upper term for human trafficking of a minor.  It rejected the probation officer's recommendation that Wilkins be

76

sentenced to the midterm. The sentences on all other counts were either one-third the midterm or the midterm stayed.

As to Wilkins, it found two aggravating factors: (1) he had prior misdemeanor convictions for "prostitution-related crimes," which demonstrated that "the conduct in this case has been a long-term antisocial type of conduct," and (2) the manner in which the crime was carried out indicated sophistication. It found no mitigating factors.

As to Vaughn, it also found two aggravating factors: (1) "he had recently been convicted and violated . . . his probation for sex trafficking of children," and (2) he had repeatedly taught others "how to pimp." Again, it found no mitigating factors.

C.      *The Requirement That Aggravating Factors Be Found True Beyond a Reasonable Doubt.*

With respect to each defendant, the trial court found, based on a certified record of conviction, that he had aggravating prior convictions. The exception in the amendment permits this.

Admittedly, as to each defendant, the trial court also relied on a second aggravating factor that had not been found true by a jury beyond a reasonable doubt. However, it found no mitigating factors. On this record, we are certain that, if we were to remand with directions that the only aggravating factor that the trial court could consider was defendants' prior convictions, it would still find that the aggravating circumstances outweigh the mitigating circumstances, and therefore it would still impose the upper

term.  It follows that "that remand would be an idle act.  [Citation.] . . .  Under these circumstances, a remand is not required."  (*People v. Flores* (2020) 9 Cal.5th 371, 432.)

Wilkins argues that he was deprived of due process because he did not have notice that his prior convictions would be used as an aggravating factor.[19]  As he notes, they were introduced at trial solely under Evidence Code section 1101, subdivision (b), and the jury was instructed that it could consider them only insofar as they showed intent, motive, knowledge, or absence of mistake.  Even under the pre-amendment statutory scheme, however, a trial court could use prior misdemeanor convictions as an aggravating factor — particularly when they showed long-term recidivism.  (Cal. Rules of Court, rules 4.408(a), 4.421(b)(2), (c); *People v. Shenouda* (2015) 240 Cal.App.4th 358, 369; *People v. Kellett* (1982) 134 Cal.App.3d 949, 962.)  The fact that the amendments *narrowed* the prosecution's ability to use a prior conviction as an aggravating circumstance does not mean that Wilkins was deprived of *notice*.

D.    *The Requirement of Imposing the Lower Term Based on Specified Mitigating Factors*.

When the crimes were committed, defendants were not "youths" (statutorily defined as persons under 26).  (§ 1170, subd. (b)(6)(B), incorporating § 1016.7, subd. (b).)  If in fact they had either experienced trauma or been a victim of domestic violence or human trafficking, they were free to introduce evidence of that as a factor in

---

[19]    Vaughn has not joined this argument, presumably because his prior conviction was expressly alleged and found true as an enhancement.  (§ 667, subd. (a).)

78

mitigation, even before the amendments to section 1170. (Cal. Rules of Court, rules 4.408(a), 4.423(b)(2), (c).) They did not do so. It follows, once again, that remand would be an idle act and thus is not required.

XI

DISPOSITION

Wilkins's sentence on count 7 (pandering of Molly) is stayed; as a result, his total sentence is reduced from 18 years to 16 years 8 months. This stay will become permanent once Wilkins has served the remainder of his sentence.

Vaughn's sentence on count 9 (pandering of Molly) is stayed; as a result, his total sentence is reduced from 19 years 8 months to 18 years 4 months. This stay will become permanent once Vaughn has served the remainder of his sentence.

The judgments, as thus modified, are affirmed. The superior court clerk is directed to prepare amended sentencing minute orders and amended abstracts of judgment and to forward a certified copy of the amended abstracts to the Department of Corrections and Rehabilitation. (§§ 1213, 1216.)

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ
P. J.


We concur:

McKINSTER
J.

FIELDS
J.